SHAW v. US AIRWAYS, INC.

[217 N.C. App. 539 (2011)]

LINDA SHAW, Widow of CURRY SHAW, Deceased Employee, Plaintiff v. US AIRWAYS, INC., Employer, AMERICAN PROTECTION INSURANCE CO., Carrier, Defendants

No. COA11-284

(Filed 20 December 2011)

**1. Workers' Compensation—death benefits—statute of limitations**

Plaintiff widow's claim for death benefits in a workers' compensation case was not untimely or barred by the statute of limitations under N.C.G.S. § 97-38. There was no determination of decedent employee's final determination of disability prior to the Commission's opinion and award determining that his death was the proximate result of his compensable injury.

**2. Workers' Compensation—death—proximately resulted from compensable injury—methadone**

The Industrial Commission did not err in a workers' compensation case by concluding that decedent employee's death proximately resulted from the 12 July 2000 compensable injury. The toxic build-up of methadone prescribed to manage decedent's pain resulting from a compensable injury to a reasonable degree contributed to his death.

Appeal by defendants from opinion and award entered 17 December 2010 by the North Carolina Industrial Commission. Heard in the Court of Appeals 12 September 2011.

*The Sumwalt Law Firm, by Vernon Sumwalt and Mark T. Sumwalt, for plaintiff-appellee.*

*Littler Mendelson, P.C., by Kimberly A. Zabroski, for defendant-appellant.*

BRYANT, Judge.

Because there was no determination of disability by the Commission, plaintiff's claim for death benefits was not barred pursuant to N.C. Gen. Stat. § 97-38. Further, because there was competent evidence in the record to support the Commission's findings of fact determining that Curry Shaw's death proximately resulted from a compensable injury, we affirm the Commission's opinion and award.

On 12 July 2000, plaintiff Curry Shaw worked as a fleet-services worker for defendant US Airways. While lifting a piece of luggage from a baggage carousel, Shaw suffered an injury to his lower back. In August, US Airways filed an Employer's Report of Injury to Employee. On 24 August 2000, US Airways and its insurance carrier filed a Form 60, Employer's Admission of Employee's Right to Compensation Pursuant to N.C. Gen. Stat. § 97-18(b). On the form, US Airways acknowledged that temporary total compensation in the amount of $550.36 per week was paid to Shaw. On 16 April 2003, US Airways and its insurance carrier, American Protection Insurance Company (collectively "defendants") filed a Form 62 again acknowledging that temporary total disability compensation at a rate of $550.36 per week was being paid to Curry Shaw.

Contesting the calculation of the average weekly wage, Shaw filed a Form 33, Request that Claim be Assigned for Hearing, and, on 25 May 2005, the matter was heard before Deputy Commissioner Phillip A. Holmes.

On 3 October 2005, Deputy Commissioner Holmes filed an opinion and award making the following pertinent findings based on the stipulation of the parties: (1) "The date of the admittedly compensable injury in this claim [was] July 12, 200[0]"; and (6) "[s]ince August 5, 200[0], Defendants have paid $550.36 each week to Plaintiff for total disability, based on an assumed weekly wage of $825.55 during the fifty-two weeks preceding July 12, 2000." The matter of the calculation of Shaw's average weekly wage was further considered by the Full Commission (the Commission), this Court, and our Supreme Court: *Shaw v. U.S. Airways, Inc.*, 186 N.C. App. 474, 652 S.E.2d 22 (2007), *rev'd*, 362 N.C. 457, 665 S.E.2d 449 (2008). The opinion of our Supreme Court, *Shaw v. U.S. Airways, Inc.*, 362 N.C. 457, 665 S.E.2d 449 (2008), was filed 27 August 2008. On 25 September 2008, Curry Shaw died.

On 8 April 2009, Curry Shaw's wife, Linda Shaw, filed a Form 18, Notice of Accident to Employer and Claim of Employee, Representative, or Dependent, claiming, on her husband's behalf, "death as a consequence of compensable injury." The same day, Shaw filed a Form 33, Request that Claim be Assigned for Hearing.

On 17 June 2009, the matter was heard before Deputy Commissioner Philip A. Baddour, III. And, on 7 June 2010, the deputy commissioner filed an opinion and award concluding that Curry Shaw's death was the proximate result of his 12 July 2000 compens-

able injury and that his wife, Linda Shaw, was entitled to death benefits at a rate of $550.36 per week for the rest of her life, unless she remarries. Defendants appealed to the Full Commission (the Commission).

On 17 December 2010, the Commission entered an opinion and award finding that the case had been the subject of prior litigation resulting in the Supreme Court decision *Shaw v. US Airways, Inc.*, 362 N.C. 457, 665 S.E.2d 449 (2008), but noted that "[t]he prior litigation did not produce a final determination of decedent's disability." The Commission concluded that on 12 July 2000, Curry Shaw suffered an admittedly compensable injury, and, as a direct and natural result, he experienced back pain. To help manage the pain, Curry Shaw's authorized treating physician, Dr. Douglas Pritchard, prescribed methadone. Curry Shaw took methadone in increasing dosages for over four-and-a-half years prior to his death. The Commission concluded that Curry Shaw died of methadone toxicity—a direct result of his methadone use and a proximate result of his original compensable back injury. The Commission further concluded that Curry Shaw "was paid temporary total disability pursuant to a Form 60 and subsequent Forms 62 until his death. At the time of [Curry Shaw's] death no 'final determination of disability' had been made within the meaning of N.C. Gen. Stat. § 97-38" and, therefore, "plaintiff's claim for death benefits [was] not barred by N.C. Gen. Stat. § 97-38."

Defendants were ordered to pay death benefits to Linda Shaw in the amount of $550.36 per week continuing for the remainder of her life or until remarriage. Defendants appeal.

---

On appeal, defendants raise two issues: Did the Commission err in concluding that (I) Shaw's claim for death benefits was timely filed; and (II) Shaw's death proximately resulted from the 12 July 2000 compensable injury.

### Standard of Review

On appeal of cases from the Industrial Commission, our review is limited to two issues: Whether the Commission's findings of fact are supported by competent evidence and whether the Commission's conclusions of law are justified by its findings of fact. Because it is the fact-finding body, the Commission is the sole judge of the credibility of the witnesses and the weight to be given their testimony. The Commission's findings of fact are conclusive on appeal if they are supported by any competent evidence.

Accordingly, this Court does not have the right to weigh the evidence and decide the issue on the basis of its weight. The court's duty goes no further than to determine whether the record contains any evidence tending to support the finding.

*Johnson v. Lowe's Cos.*, 143 N.C. App. 348, 350, 546 S.E.2d 616, 617-18 (2001) (citations and quotations omitted).

*I*

[1] Defendants argue that plaintiff's claim for death benefits is barred by the statute of limitations. Curry Shaw died on 25 September 2008. Defendants note, and we agree, that this occurred more than six years after the date of Curry Shaw's 12 July 2000 injury. However, defendants argue that more than two years passed after entry of Deputy Commissioner Holmes' opinion and award making the uncontested finding that defendants paid Curry Shaw $550.36 each week for temporary total disability. Defendants contend that this uncontested finding amounts to a final determination of disability and, as a result, Linda Shaw's 8 April 2009 claim for death benefits was untimely and barred by the statute of limitations under N.C. Gen. Stat. § 97-38. We disagree.

Under North Carolina General Statutes, section 97-38,

> If death results proximately from a compensable injury or occupational disease and within six years thereafter, or within two years of *the final determination of disability*, whichever is later, the employer shall pay or cause to be paid, subject to the provisions of other sections of this Article, weekly payments of compensation equal to sixty-six and two-thirds percent (66 2/3%) of the average weekly wages of the deceased employee at the time of the accident . . . .

N.C. Gen. Stat. § 97-38 (2009). As noted by the Commission in the opinion and award entered 17 December 2010, defendants paid temporary total disability to Curry Shaw pursuant to a Form 60 and subsequent Form 62. Entry of these forms raises only a presumption of disability, not a final determination. *See Treat v. Mecklenburg County*, 194 N.C. App. 545, 669 S.E.2d 800 (2008).

> Under the Workers' Compensation Act, disability is defined by a diminished capacity to earn wages, not by physical infirmity. Thus, the employee has the burden "to show that he is unable to earn the same wages he had earned before the injury, either in the same employment or in other employment." *Russell v.*

*Lowes Product Distribution,* 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993) . . . .

*Knight v. Wal-Mart Stores, Inc.,* 149 N.C. App. 1, 7, 562 S.E.2d 434, 439 (2002) (citations omitted).

There is nothing in the record to indicate that Shaw was paid anything other than temporary total benefits pursuant to Forms 60 and 62. *See Estate of Apple v. Commercial Courier Express, Inc.,* 165 N.C. App. 514, 598 S.E.2d 625 (2004) (finding that a Form 21 was not a final determination of disability).

Therefore, as there was no determination of Curry Shaw's final determination of disability prior to the Commission's 17 December 2010 opinion and award determining that his death was the proximate result of his 12 July 2000 compensable injury, Linda Shaw's 8 April 2009 claim for death benefits was not untimely and not barred by the statute of limitations under N.C. Gen. Stat. § 97-38. Accordingly, defendants' argument is overruled.

## II

**[2]** Next, defendants argue that the Commission erred in concluding that Curry Shaw's death proximately resulted from the 12 July 2000 compensable injury. Defendants contend that (A) the Commission's finding that Curry Shaw took methadone in "substantial compliance" with his authorized physician's prescription is unsupported; (B) Curry Shaw's death was caused by a non-work related fatty liver disease; and (C) the medical expert testimony presented fails to support a conclusion of proximate cause.

Workers Compensation death benefits are governed by section 97-38 of the North Carolina General Statutes. *Booker-Douglas v. J. & S. Truck Serv.,* 178 N.C. App. 174, 177, 630 S.E.2d 726, 729 (2006). "For death benefits to be awarded under this statute, a compensable injury must be the proximate cause of the employee's death." *Id.* (citation omitted).

## A

Defendants contend that the Commission's finding that Curry Shaw took methadone in "substantial compliance" with his authorized physician's prescription is not supported by the evidence of record. We disagree.

Here, the Commission made the following contested finding of fact: "The greater weight of the evidence shows that decedent more

SHAW v. US AIRWAYS, INC.

[217 N.C. App. 539 (2011)]

likely than not took his methadone in substantial compliance with Dr. Pritchard's prescription."

Because our review is limited to two issues: Whether the Commission's findings of fact are supported by competent evidence and whether the Commission's conclusions of law are justified by its findings of fact, we look to the record evidence for competent evidence in support of the Commission's finding. *See Lowe's Cos.*, 143 N.C. App. at 350, 546 S.E.2d at 617-18.

Linda Shaw gave the following testimony before Deputy Commissioner Philip A. Baddour, III:

Q.   Dr. Pritchard is a pain management doctor? Is that accu rate?

A.   Yes, he is.

Q.   Did Dr. Pritchard provide medications for Curry?

A.   Yes, he did.

Q.   Was methadone one of those medications?

A.   Yes, it was.

. . .

Q.   How was Curry in taking his medications?

A.   Very careful. Every morning he would get up, and he would count out the number of pills that he should be taking during the day. He put them in a small bottle, and then he would take them as he needed them. You know, if there were a couple left over that day, that was great. Then the next morning he would add whatever he had to make it up to that full amount again for a day, but he would never go past what he was supposed to take during one day. He was very careful about that.

Further, the deposition of Dr. Pritchard provided the following testimony:

Q.   . . . [O]ne of the issues we have in this Workers' Compensation claim is whether Curry Shaw took methadone as a consequence of his work-related injury. Did he, in fact, take that medication because of his back injury?

A.   Yes, he did.

Q.   Generally speaking, how many years had he taken methadone?

A.   Probably at least four or five years he had been on methadone.

. . .

Q.   And over the years that Mr. Shaw had taken methadone, had he ever had any problems in terms of abuse or overuse at all?

A.   No.

Q.   What goes into monitoring a patient in terms of how they use methadone? Is there a way to check what levels?

A.   Yes, you can do levels, and sometimes we'll do that. Urine drug screens are another way that we can do that. So there are various ways you can measure it. Another one is compliance, whether they're compliant with medicines and if they're taking the correct number of pills. If you give them 90 pills, take one three times a day, and they are out in two weeks, obviously that's non-compliance. So compliance is an issue. Urine drug screens are another, which actually lets you measure quantitative levels of some of these medicines.

Q.   . . . Curry Shaw started on methadone somewhere back in May of 2004, give or take?

A.   Yes, that's about right.

Q.   So he was on methadone from that point in time all the way 'til the time he passed away in September of 2008?

A.   Yes.

Q.   During those four and a half years or so over four years, had he ever been non-compliant with his methadone?

A.   No.

Q.   Had he ever been non-compliant with the other pain medications that he was taking?

A.   No.

As the record contains competent evidence in support of the Commission's finding that Curry Shaw "took his methadone in sub-

stantial compliance with Dr. Pritchard's prescription," we are compelled to uphold the finding of fact.

## B

Defendants contend that Curry Shaw's death was caused by an "insidious development of non work-related fatty liver disease." Specifically, defendants argue that if Curry Shaw adhered to the prescribed amounts of methadone, yet died as a result of methadone toxicity, his death was attributable to the inability of his liver to properly detoxify the methadone from his system and was not the natural consequence of his compensable injury. Therefore, defendant's contend the Commission improperly awarded death benefits for a non-work related medical condition. We disagree, and note that defendants failed to provide any legal authority for their argument.

With regard to the cause of Curry Shaw's death, the Commission made the following finding of fact:

> 17. The greater weight of the medical evidence further shows that decedent's insidious development of fatty liver disease gradually impaired his liver's metabolic efficiency so that his regular ingestion of methadone caused his death by methadone toxicity, even though he was taking therapeutic levels of methadone as prescribed. The severe fatty liver disease was a contributing factor in decedent's death, because as the disease worsened, it decreased decedent's metabolism of and tolerance to methadone, since his liver could no longer efficiently detoxify the methadone.

This Court has previously held

> the "work-related injury need not be the sole cause of the problems to render an injury compensable." *Hoyle v. Carolina Associated Mills*, 122 N.C. App. 462, 465, 470 S.E.2d 357, 359 (1996). "If the work-related accident 'contributed in some reasonable degree' to [the] plaintiff's disability, [he] is entitled to compensation." *Id.* at 466, 470 S.E.2d at 359 (citing *Kendrick v. City of Greensboro*, 80 N.C. App. 183, 187, 341 S.E.2d 122, 124, *disc. review denied*, 317 N.C. 335, 346 S.E.2d 500 (1986)).

*Goforth v. K-Mart Corp.*, 167 N.C. App. 618, 622, 605 S.E.2d 709, 712 (2004).

> [Furthermore,] when a pre-existing, nondisabling, non-job-related condition is aggravated or accelerated by an accidental

injury arising out of and in the course of employment . . . so that disability results, then the employer must compensate the employee for the entire resulting disability even though it would not have disabled a normal person to that extent.

*Ard v. Owens-Illinois*, 182 N.C. App. 493, 498, 642 S.E.2d 257, 260-61 (2007) (citation omitted and emphasis removed).

To assert that Curry Shaw's death was *solely* the result of a non-work related liver disease is an untenable argument. The toxic build-up of methadone prescribed to manage Curry Shaw's pain resulting from a compensable injury to a reasonable degree contributed to his death. Therefore, defendants' argument that Curry Shaw's death was solely attributable to his liver disease and was in no way the natural consequence of his compensable injury is overruled.

## C

Lastly, defendants contend that the Commission's determination that Curry Shaw's death was proximately caused by his compensable injury is unsupported by medical expert testimony. Specifically, defendants argue that the evidence fails to support a direct or immediate relationship between Curry Shaw's death and the compensable injury he sustained over eight years earlier. We disagree.

The Commission made the following findings of fact:

4. . . . Dr. Pritchard began prescribing methadone to address decedent's back pain.

. . .

10. . . . Toxicological measurements taken during the autopsy were . . . positive for methadone.

. . .

11. All of [the] laboratory measurements upon autopsy confirmed that decedent died as the result of methadone toxicity. All of the forensic pathologist and medical examiners testifying in this case agreed that these levels of methadone were toxic and that decedent's cause of death was methadone toxicity.

12. Based on the toxic levels of methadone in decedent's system, Dr. Maryanne Gaffney-Kraft of the North Carolina Medical Examiner's Office amended decedent's death certificate in April 2009 to reflect that the cause of his death was acute

methadone toxicity and that the manner of his death was accidental. Dr. Kraft is associate chief medical examiner and an expert in the field of forensic pathology and medical examination. Dr. Kraft testified that . . . [in] her expert opinion [] the methadone levels found in decedent's body were consistent with therapeutic dose for a man who had been taking methadone at the levels he was for four years. Dr. Kraft believed and the Full Commission finds that because plaintiff was prescribed methadone to treat his back pain, then the back pain was an indirect cause of death.

Curry Shaw's authorized treating physician, Dr. Pritchard, testified that he prescribed methadone to Shaw as a consequence of his work-related back injury and that, pursuant to Dr. Pritchard's prescription, Shaw used an increasing dosage of methadone for over four years. Following Shaw's death, an autopsy was performed and the results reviewed by Associate Chief Medical Examiner for the State of North Carolina Maryanne Gaffney-Kraft, D.O. Dr. Gaffney-Kraft provided the following testimony by deposition.

Q. Do you have an opinion to reasonable degree of medical certainty in the field of medicine, which you practice, as to the cause of Mr. Curry Shaw's death?

A. Yes, I do.

Q. A. The cause of death of Mr. Curry Shaw is acute methadone toxicity.

. . .

It means that Mr. Curry had a level of methadone in his system, which is considered toxic, that causes death. The level, again, based on the blood work that was sent in with the—with the autopsy, we interpret that based on therapeutic levels, toxic levels, that we have through the state and through our toxicologist, and based on the level that he had, his level was considered in a toxic range, which means it would have caused his death.

Gaffney-Kraft, D.O., further testified that samples were taken from Shaw's aortic blood, his femoral blood, and his liver. Shaw had a level of 1.9 milligrams per liter of methadone in his femoral blood, 3.3 milligrams per liter in his aorta, and 8.0 milligrams per kilogram in his liver. Gaffney-Kraft testified that these levels were consistent with Curry Shaw's prescribed dosage and duration of methadone use. The

MALLOY v. DAVIS MECH., INC.

[217 N.C. App. 549 (2011)]

medical examiner found no other grounds on which to base Curry Shaw's death.

> Q.   If we were to ask you to [] assume that [Curry Shaw] was taking methadone because of his back pain and his back injury, could you—or do you have an opinion as to whether the back pain was an indirect cause of his death?

> A.   Yes. If he was prescribed methadone to treat back pain, then the back pain would have to be an indirect cause of death.

As there is competent evidence from a witness admitted as an expert in the fields of forensic pathology and medical examination to support the Commission's finding of a direct relationship between the compensable injury Curry Shaw sustained on 12 July 2000 and his death, defendants' argument is overruled.

Affirmed.

Chief Judge MARTIN and Judge CALABRIA concur.